SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

JAN 1 7 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of ) | |
| The residence at 1305 Country Club Drive, Olivehurst, ) CA; ) | Case No. |
| ) | |
| A grey Chevrolet Tahoe bearing California license plate ) 8CFJ596; and ) | **2:19-SW. 0038   EFB** |
| The person of Rick VARDELL ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENTS A-1 and A-2, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §841(a)(1) | Distribution of hydrocodone |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aaron Kacalek, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-17-2019

_____
*Judge's signature*

City and state:   Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF DEA TASK FORCE OFFICER AARON KACALEK  IN SUPPORT OF
A CRIMINAL COMPLAINT, ARREST WARRANT, AND SEARCH WARRANT**

I, Aaron Kacalek, being duly sworn, hereby depose and state:

**Purpose**

1. This affidavit is made in support of criminal complaint and arrest warrant for:

Rick Glenn VARDELL (Counts 1-3)

| | |
|---|---|
| **COUNT ONE:** | Distribution of approximately 400 10 milligram Hydrocodone tablets (218.8 gross grams), a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (August 26, 2018). |
| **COUNT TWO:** | Distribution of approximately 590 10 milligram Hydrocodone tablets (380 gross grams), a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (September 10, 2018). |
| **COUNT THREE:** | Distribution of approximately 1000 10 milligram Hydrocodone tablets (498.9 gross grams), a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (December 20, 2018). |

2. This affidavit is also made in support of a warrant to search the following locations:

   a. 1305 Country Club Drive, Olivehurst, California, a residence more fully described in **Attachment A-1**;

   b. The grey Chevrolet Tahoe bearing California license plate 8CFJ596, more fully described in **Attachment A-2**; and

   c. The person of Rick VARDELL

3. This Affidavit requests authority to search the locations described in Attachments A-1 and A-2 in order to located and seize the items described in Attachment B as evidence and instrumentalities of violations of 21 U.S.C.  §§ 841(a)(1) and 846 – conspiracy to distribute, distribution, and possession with intent to distribute hydrocodone.

**INTRODUCTION AND AGENT BACKGROUND**

4. I am a Task Force Officer (a "TFO") with the Drug Enforcement Administration ("DEA") operating out of the Sacramento District Office (the "DEA-SDO"), and have been since September 2014.  I have held this assignment since September 2014.  As a

1

TFO on the DEA Task Force, I have been sworn as a deputized agent with the DEA.  I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

5.  The DEA Task Force, which is federally funded, is a collaborative group of officers and agents from the DEA and state and local law enforcement agencies such as the California Highway Patrol (the "CHP"), Sacramento Police Department, California Department of Corrections and Rehabilitation, El Dorado County Sheriff Department, and El Dorado County District Attorney's Office.  The goal of the DEA Task Force is to investigate and disrupt illicit drug trafficking in specified geographical areas by immobilizing the highest levels of targeted violators and trafficking organizations.

6.  As a TFO on the DEA Task Force, I have been assigned to assist in multiple investigations involving high-level drug traffickers.  In March 2015, I was assigned to the Tactical Diversion Squad within the DEA.  This squad combines resources of federal, state, and local law enforcement agencies in an effort to investigate, disrupt, and dismantle activities of individuals and organizations suspected of violating federal narcotics-related criminal laws and federal, state, and local statutes pertaining to the diversion of licit pharmaceutical controlled substances and listed chemicals.  I am also responsible for searches of targets on probation or parole who are associated with drug trafficking; authoring and disseminating current information on drug trafficking patterns; monitoring and assessing drug activity; and providing training to CHP officers regarding drug trafficking.

7.  I am also a Peace Officer with the California Highway Patrol and have held this position since June 1999.  Prior to my current assignment as a TFO, my prior assignments have included CHP patrol duties in the Sacramento and Los Angeles areas.

8.  I have received over 1,200 hours of law-enforcement training in the California Highway Patrol ACHP academy (the "CHP Academy").  Subsequent to my academy training, I received over 400 hours of law-enforcement training from multiple Federal, State, and local law enforcement agencies in regard to a wide variety of topics, including, but not limited to, ethics, criminal investigations, annual legal updates, current law enforcement trends, perishable skills, law- enforcement techniques, gang investigations, computer crimes, managing criminal informants, and narcotic investigations.

9.  In October 2003, I attended and successfully completed an 80-hour Drug Recognition Expert program at the CHP Academy.  In March 2007, I attended the 40-hour CHP criminal apprehension program.  This class, taught by investigators, included training in investigative techniques, street gangs, firearm related offenses and narcotics enforcement.

10. Between 1999 and 2019, I conducted no fewer than 500 investigations of unlawful activity concerning controlled substances, vehicle theft, homicide, identity theft, fraud, weapon crimes, gang crimes, and various assaults.  During these investigations, I

received information from offenders regarding their criminal methodology. I also received instruction from and observed the investigative techniques used by experienced law enforcement officers.

11. I am familiar with the manner in which illegal drugs are imported, manufactured, and distributed; methods of payment for such drugs; efforts of persons involved in such activities to avoid detection by law enforcement; and methods used to finance drug transactions and launder drug proceeds.

12. I am familiar with the manner in which prescription pharmaceuticals are diverted for illicit use.  I am also familiar with the means through which persons counterfeit prescription pharmaceuticals and profit therefrom.

13. I have been recognized in open court as an expert witness in the use, sales, and transportation of controlled substances.

14. The facts and information set forth herein are true based upon my personal knowledge and observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me, my review of investigative reports, notes, transcripts, review of recorded telephone calls, and discussions with other federal, state and local law enforcement officials.  Because this affidavit is submitted for the limited purpose of supporting the requested search warrant, I have not included the details of every aspect of the investigation.  I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the search and seizure of the property identified in this affidavit.

## STATEMENT OF PROBABLE CAUSE

### Background of Investigation

15. In July 2018, a DEA Confidential Source (CS) contacted DEA agents with information of a Vicodin and marijuana Source of Supply (SOS) within the Yuba City County, CA area. The CS identified the SOS as Rick VARDELL with telephone number 530-682-6884 (Target Cellphone).  The CS indicated that VARDELL was involved in the sale of Vicodin tablets in quantities of 1000 or more at one time.  Rick VARDELL is an adult male born on **/**/1962.  Based on a check of the NCIC, VARDELL does not have a criminal record as of January 9, 2019.

16. The DEA Sacramento District Office began investigating the drug trafficking activities of Rick VARDELL in Olivehurst California and surrounding areas.  On July 16, 2018, an administrative subpoena was issued to AT&T requesting subscriber information and call detail records for the Target Cell Phone.  The results indicate that the subscriber is Vardell's Air Conditioning, 241 Garden Hwy, Yuba City, California, (CA), and that the phone was activated on October, 23 2015.

17. During this investigation, through the use of the CS, the DEA was able to conduct multiple controlled purchases of approximately 2000 Hydrocodone tablets.

18. The CS has been cooperating with the DEA on this case since July 2018. The CS has no prior felony convictions. Throughout his or her time as a CS, the information the CS has provided has proven reliable. The DEA has paid the CS for the information he or she has provided. I am not aware of the CS providing false or misleading information during this investigation. For these reasons, I believe the CS is reliable.

**August 26, 2018 controlled purchase of approximately 400 hydrocodone pills from VARDELL.**

19. On August 26, 2018, the CS made a telephone call to VARDELL at telephone number 530-682-6884 to arrange the purchase of hydrocodone tablets. VARDELL did not answer this attempted telephone call. Later the same day, the CS received a text message from VARDELL from telephone number 530-682-6884 stating, "Good morning buddy . . Sorry I had a problem come up unexpectedly that I had to handle, How long will you be around?" The CS responded to VARDELL stating, "I have to head out for fires today, can I come to you. When is a good time for you buddy." The text message communication was later photographed and processed as evidence at the DEA Sacramento District Office.

20. Subsequently, at approximately 11:55 a.m., the CS made a telephone call to VARDELL at the Target Cellphone to negotiate a time and location for the controlled purchase. VARDELL indicated he would not be available for a couple of hours. The CS stated s/he would text VARDELL the amount of pills the CS needed. At approximately 12:14 p.m., the CS placed a text message to VARDELL stating, "I'll take a 500cc dirt bike and I got a thousand for you for my debt if u wanna meet at 2 that works for me I'll take the family for lunch I'm starving." Group Supervisor Scott Wight and I were with the CS at the time of the text to VARDELL. The CS explained "500cc" was code for Hydrocodone pills. The text message communication was later photographed and processed as evidence at the DEA Sacramento District Office.

21. At approximately 1:50 p.m., the CS informed me that VARDELL was at his ex-wife's residence (5412 Feather River Boulevard, Olivehurst, CA). The CS informed me that VARDELL was driving a newer model Chevrolet Tahoe grey/blue in color with paper plates.

22. At approximately 2:03 p.m., TFO Johnson observed a Shadow Gray Metallic, Chevrolet Tahoe with a lift kit, black rims, and paper license plates from John L. Sullivan, parked in the driveway of 5412 Feather River Boulevard.

23. At approximately 2:05 p.m., GS Wight and I met with the CS at a neutral meeting location. I searched the CS's vehicle for weapons and contraband with negative results, as witnessed by GS Wight. I provided the CS with $4,000.00 in Officially Authorized

Funds, as witnessed by GS Wight.  I also provided the CS with multiple concealed audio recorders and transmitters.

24. At approximately 2:39 p.m., SA Melvin Sinoben observed the CS meet with VARDELL in the driveway of 5412 Feather River Boulevard.  At approximately 2:42 p.m., TFO Johnson heard, via the concealed audio recorder/transmitter, the CS and VARDELL discussing the amount of money and pills being purchased.  Later it was determined the CS purchased approximately 400 hydrocodone tablets from VARDELL. The suspected hydrocodone pills were processed as evidence at the DEA Sacramento District Office and transferred to the DEA Western Laboratory for analysis. The lab results indicated that the substance purchased contained Hydrocodone and Acetaminophen. The white, capsule-shaped tablets with the imprint A/40 is, in my training and experience, consistent with pills containing hydrocodone and acetaminophen.

25. At approximately 2:44 p.m., SA Sinoben observed VARDELL exit the Tahoe's front driver side door and the CS exit the Tahoe's front passenger door.  SA Sinoben observed VARDELL walk back into the open roll up garage door of the residence located at 5412 Feather River Boulevard while the CS left the area in her/his vehicle.

26. At approximately 2:47 p.m., TFO Johnson drove by 5412 Feather River Boulevard and positively identified VARDELL as the subject the CS met with and conducted the controlled purchase with.

27. At approximately 3:00 p.m., SA Sinoben observed VARDELL enter the driver's seat of the Tahoe and depart the residence north bound on Feather River Boulevard.  At approximately 3:04 p.m., SA Sinoben observed VARDELL pull into the Burger King drive-through at 1101 North Beale Road, Marysville CA 95901.  At approximately 3:08 p.m., SA Sinoben observed VARDELL exit the drive-through of Burger King and travel south bound on Feather River Boulevard.  At approximately 3:10 p.m., SA Sinoben observed VARDELL turn east bound onto Cottonwood Avenue and then begin to drive at a very slow speed.  Moments later, SA Sinoben observed VARDELL turn from Cottonwood Avenue onto Grand Avenue and travel south bound, towards Feather River Boulevard.  At approximately 3:11 p.m., SA Sinoben observed VARDELL continue onto Feather River Boulevard continuing south bound. NOTE: In my training and experience, the driving pattern exhibited by VARDELL at this time was indicative of counter surveillance techniques which are routinely performed by criminals in an effort to detect the presence of law enforcement.

28. At approximately 3:19 p.m., SA Sinoben observed VARDELL pull into the driveway of 1305 Country Club Drive and park in front of the garage of the residence. At approximately 3:21 p.m., SA Sinoben observed VARDELL exit the front driver's side of the Tahoe, walk into the garage of the residence, and close the garage door behind him.

*September 10, 2018 controlled purchase of approximately 590 Hydrocodone pills from VARDELL at his residence of 1305 Country Club Drive, Olivehurst California.*

29. On September 10, 2018, at approximately 9:57 a.m., the CS made a recorded telephone call to telephone number 530-682-6884, used by Rick VARDELL. During this call, the CS negotiated the controlled purchase of hydrocodone tablets for later the same day. This call was recorded.

30. I provided the CS with three concealed recorder/transmitters and $5,000.00 in Official Advanced Funds (OAF) for the purchase of Hydrocodone tablets, as witnessed by SA Tran. SA Tran and I then surveilled the CS from the neutral location to 1305 Country Club Drive, Olivehurst, CA, where the CS intended to meet with VARDELL to purchase the Hydrocodone tablets. Following the meeting with VARDELL, SA Tran and I followed the CS back to the neutral location for a debriefing.

31. The CS indicated s/he drove to 1305 Country Club Drive, Olivehurst California to meet with VARDELL. The CS indicated that upon his/her arrival s/he parked in front of the residence. The CS walked into the residence through the open front door. The CS announced his/her presence and VARDELL answered and invited him/her inside the residence.

32. The CS made contact with VARDELL in the kitchen of the residence. VARDELL immediately retrieved three bags of white tablets from within the kitchen. VARDELL then began counting the tablets out on the kitchen counter top. VARDELL eventually counted out 590 tablets from the three bags. VARDELL stated there should have been two hundred in each bag. VARDELL stated he (VARDELL) had received the tablets as payment for rent. VARDELL stated he (VARDELL) would follow up with the person who shorted him ten tablets. NOTE: VARDELL has multiple rental houses in the Yuba City / Marysville Area.

33. VARDELL stated the 590 tablets would be $2950.00 at $5.00 a tablet. VARDELL talked about having just offloaded thousands of hydrocodone tablets for $3.00 a tablet. VARDELL related that he (VARDELL) should have kept the tablets and sold them for a higher price because the tablets are in such high demand. VARDELL told the CS he would get more tablets in the near future, but they would be yellow in color.

34. VARDELL instructed the CS on how to get a higher price for the tablets. VARDELL stated not to sell the pills in bulk because it would help drive up the price. VARDELL told the CS to act as if s/he (CS) was out of tablets. VARDELL went on to say that he (VARDELL) had a lot of people he collected the pills from. VARDELL told the CS that many people's doctors had cut the prescription quantities in half. VARDELL gave an example about a guy who used to get 400 pills, but now only gets 200. VARDELL described another individual who used to get 190 pills, but now only received half of what he used to get.

35. During the conversation, VARDELL spoke about how he (VARDELL) would soon have foot surgery and would be receiving pain medicine prescriptions. VARDELL stated that the good thing about having the medical prescription was that it would give him (VARDELL) a valid reason to have the prescription tablets.

36. On multiple occasions during the conversation between the CS and VARDELL, VARDELL spoke about having made a lot of money over the years selling marijuana. VARDELL went on to say that there was no money in selling marijuana on the black market anymore because the price per pound had dropped so significantly.

37. After the meet inside the residence, the CS exited the front door of the residence and re-entered the CS vehicle. The CS drove to a predetermined neutral location and met with SA Tran and me. I obtained a white plastic bag containing a brown paper bag which contained small bags with white tablets later determined to be approximately 590 tablets of Hydrocodone. The suspected hydrocodone pills were processed as evidence at the DEA Sacramento District Office and transferred to the DEA Western Laboratory for analysis. The lab results indicated that the substance purchased contained Hydrocodone and Acetaminophen. The pills were white, capsule-shaped, with the imprints A/40 and G037. In my training and experience these imprints are consistent with pills containing hydrocodone.

38. I searched the CS for contraband and weapons with negative results. SA Tran searched the CS's vehicle for contraband and weapons with negative results.

39. I later listened to the audio recordings and video recording of the controlled purchase. Both recordings corroborated the information which the CS gave to the DEA. The audio and audio/video recordings of the meeting between the CS and VARDELL on September 10, 2018 were later booked into evidence at the DEA.

### December 20, 2018 controlled purchase of approximately 1000 Hydrocodone tablets from VARDELL at his residence 1305 Country Club Drive, Olivehurst California.

40. On December 20, 2018, at approximately 7:15 p.m., GS Wight, SA Tran, and I met with the CS at a neutral meet location. The CS's vehicle was searched by GS Wight for weapons and contraband with negative results, as witnessed by SA Tran. I searched the CS for weapons and contraband with negative results, as witnessed by SA Tran. I witnessed SA Tran provide the CS with $6,000.00 in Officially Authorized Funds. I also provided the CS with concealed audio recorder/transmitter and a video recorder.

41. At approximately 7:50 p.m., the CS received a text from the phone number 530-682-6884, used by VARDELL, indicating that VARDELL was ready to meet at VARDELL's residence. The CS departed the neutral location followed by surveillance units.

42. At approximately 8:05 p.m., I observed the CS arrive at VARDELL's residence. The CS pulled up to VARDELL's closed gate. The CS called VARDELL via telephone and told

VARDELL that s/he was at the front gate.  VARDELL stated the gate code was "6708 pound."  The gate opened and the CS drove onto the property.

43. While the CS was inside the residence, I heard, via the concealed audio recorder/transmitter, the CS and VARDELL counting either money or tablets.

44. At approximately 8:30 p.m., I observed the CS leaving VARDELL's residence. Surveillance units continued to follow the CS to the neutral location.

45. Following the meeting between the CS and VARDELL, the CS indicated s/he drove to 1305 Country Club Drive, Olivehurst California to meet with Rick VARDELL.  The CS indicated upon his/her arrival s/he parked in front of the residence.  The CS walked to the front door of the residence and VARDELL opened the door.  The CS and VARDELL walked to the kitchen for the pending narcotics transaction.

46. The CS stated that there were ten clear plastic bag with white pills contained within each of the 10 bags. VARDELL indicated that 100 pills were in each of the 10 clear plastic bags.  VARDELL then began counting the $6,000.00 OAF.  VARDELL eventually counted out $6,000.00 of OAF.  VARDELL stated there should be one hundred pills in each bag and placed all ten clear plastic bags into a white plastic bag. The white tablets were later determined to by Hydrocodone tablets.

47. VARDELL stated that he could get more pills next week that would be yellow in color. Additionally, VARDELL stated that he would buy pills only for resale and pharmacies were no longer selling yellow pills due to the high cost.

48. After the meet inside the residence, the CS exited the front door of the residence and re-entered the CS vehicle.  The CS drove to a predetermined neutral location and met with SA Tran and me.  I obtained a white plastic bag containing ten small bags with white tablets later determined to be approximately 1000 tablets of Hydrocodone.  The suspected hydrocodone pills were processed as evidence at the DEA Sacramento District Office and transferred to the DEA Western Laboratory for analysis. The lab results of the substance purchased are pending.  The pills were white and capsule-shaped, with the imprints RP H10/325 and G037.  In my training and experience, these imprints are consistent with pills containing hydrocodone.

49. The CS's vehicle was searched by GS Wight for weapons and contraband with negative results, as witnessed by SA Tran.  I searched the CS for weapons and contraband with negative results, as witnessed by SA Tran.

50. I later listened to the audio recordings and video recording of the controlled purchase. Both recordings corroborated the information which the CS had given to the DEA. Audio and audio/video recordings of the meeting between the CS and VARDELL on December 20, 2018 were later booked into evidence at the DEA.

### Affiant's Experience Regarding Items to Be Seized

51. Based on my training and experience and on consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

52. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic devices. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices

53. Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

54. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

55. Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

56. Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities

and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets (S); (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; (d) Using money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

57. Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

58. Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

59. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in the Attachment B attached to each of the locations requested.

60. Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore I am requesting permission to search all outbuildings located at each of the locations requested.

61. Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

62. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash

purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering."

63. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

64. Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

65. Persons engaged in illegal activities and/or money laundering often maintains such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience, where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time. In addition, I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

66. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

67. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

68. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

### **Request to Seal**

69. I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, search warrant, arrest warrants complaint, and affidavit. I believe that sealing these documents is necessary because the persons to be arrested and the items and information to be seized are relevant to an ongoing investigation into criminal activities by VARDELL and his coconspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested.

*[Continued on the next page.]*

## **Conclusion**

70. The facts set forth in this affidavit demonstrate probable cause to believe that the locations listed in **Attachments A-1** and **A-2** to this affidavit contain evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, conspiracy to distribute, distribution, and possession with intent to distribute hydrocodone, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

71. The facts set forth in this affidavit also demonstrate probable cause to believe that Rick VARDELL has been distributing large amounts of hydrocodone in the Eastern District of California. I therefore request that a Criminal Complaint and Arrest Warrant be issued for Rick VARDELL, charging him with distribution and conspiracy to distribute and possess with intent to distribute hydrocodone, in violation of 21 U.S.C. § 846 and 841(a)(1).

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

AARON KACALEK
DEA Task Force Officer

Sworn and Subscribed to me
on January 17, 2019

Hon. EDMUND F. BRENNAN
United States Magistrate Judge

Approved as to form:

Cameron L. Desmond
Assistant United States Attorney

13

### Attachment A-1

### 1305 Country Club Drive, Olivehurst, California

Location to be Searched: **1305 Country Club Drive, Olivehurst, California** is a residence, two-story, single family structure of approximately 5,500 square feet (estimated) on 1.25 acres, with an unknown number of bedrooms and bathrooms with a 5 car attached garage.   An in-ground pool is located in the rear of the property.  The property is surrounded by a six-foot black iron fence.  The nearest intersection is Feather River Boulevard, located to the west of the residence.  The front door faces south/west and is dark wood color.  The entrance to the property is located on Country Club Drive on the north side of the road.  The driveway is accessed by a large black metal gate with a large "V" on the gate.  The gate is opened by remote or a digital code.  In front of the gate to the driveway are two 6 to 8 foot high statues of white lions.  The driveway is approximately 400 feet long lined with approximately 20 foot high palm trees on the left and right side of the driveway.  The digits 1305 are located on the mailbox directly to the south across Country Club Drive.



1305 Country Club Rd
1305 Country Club Rd, Olivehurst, CA 95961

1305 Country Club Rd
1305 Country Club Rd, Olivehurst, CA 95961

**Including the person of Rick Glenn Vardell.**

**Attachment A-2**

<u>Vehicle to be Searched</u>**:  A grey Chevrolet Tahoe** assigned California License plate **8CFJ596** with a Vehicle Identification Number (VIN) of **1GNSKBKC8JR170214**.  The vehicle may missing the required California license plates.  It is described as a Shadow Gray Metallic, Chevrolet Tahoe with a lift kit, black rims, and paper license plates from John L. Sullivan.

## ATTACHMENT B
## ITEMS TO BE SEIZED

1.     Any pharmaceutical tablets, counterfeit pharmaceuticals, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2.     United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3.     Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from narcotics distribution and the transfer, investment, control and disposition of those proceeds;

4.     Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5.     Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

6.     Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.     Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.     Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9.     Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| The residence at 1305 Country Club Drive, Olivehurst, CA; ) | Case No. |
| ). | |
| A grey Chevrolet Tahoe bearing California license plate ) | **2:19-SW.0038   EFB** |
| 8CFJ596; and ) | |
| The person of Rick VARDELL ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the            Eastern           District of                California               *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 and A-2, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before            January 31, 2019            *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for ____ days *(not to exceed 30)* ☐   until, the facts justifying, the later specific date of _____ .

Date and time issued:    *1-17-2019*
                            *at  10:52 A.M.*

_____
Judge's signature

City and state:      Sacramento, California            Edmund F. Brennan, U.S. Magistrate Judge
                                                        *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____     _____
Signature of Judge                                      Date

### Attachment A-1

### 1305 Country Club Drive, Olivehurst, California

Location to be Searched: **1305 Country Club Drive, Olivehurst, California** is a residence, two-story, single family structure of approximately 5,500 square feet (estimated) on 1.25 acres, with an unknown number of bedrooms and bathrooms with a 5 car attached garage.   An in-ground pool is located in the rear of the property.  The property is surrounded by a six-foot black iron fence.  The nearest intersection is Feather River Boulevard, located to the west of the residence.  The front door faces south/west and is dark wood color.  The entrance to the property is located on Country Club Drive on the north side of the road.  The driveway is accessed by a large black metal gate with a large "V" on the gate.  The gate is opened by remote or a digital code.  In front of the gate to the driveway are two 6 to 8 foot high statues of white lions.  The driveway is approximately 400 feet long lined with approximately 20 foot high palm trees on the left and right side of the driveway.  The digits 1305 are located on the mailbox directly to the south across Country Club Drive.



1305 Country Club Rd
1305 Country Club Rd, Olivehurst, CA 95961

1305 Country Club Rd
1305 Country Club Rd, Olivehurst, CA 95961

**Including the person of Rick Glenn Vardell.**

**Attachment A-2**

Vehicle to be Searched**:** A **grey Chevrolet Tahoe** assigned California License plate **8CFJ596** with a Vehicle Identification Number (VIN) of **1GNSKBKC8JR170214**.  The vehicle may missing the required California license plates.  It is described as a Shadow Gray Metallic, Chevrolet Tahoe with a lift kit, black rims, and paper license plates from John L. Sullivan.

## ATTACHMENT B
## ITEMS TO BE SEIZED

1. Any pharmaceutical tablets, counterfeit pharmaceuticals, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2. United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3. Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from narcotics distribution and the transfer, investment, control and disposition of those proceeds;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.